# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA

v.

FROYLAN BAUTISTA (DOB: 1969),

**CRIMINAL COMPLAINT**

**CASE NUMBER:** 13-M-481

I, Dave Baker, the undersigned complainant, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

On or about November 27, 2012, in Milwaukee County, in the State and Eastern District of Wisconsin, Froylan Bautista did knowingly and intentionally to distribute a mixture and substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(C), and 846, and Title 18, United States Code, Section 2.

I further state that I am a task force officer deputized by the U.S. Department of Justice, Federal Bureau of Investigation, and this complaint is based on the following facts:

Please see the attached affidavit of Special Agent Dave Baker:

Continued on the attached sheet and made a part hereof:     X  Yes  ___ No

_____
Signature of Complainant: Dave Baker

Sworn to before me and subscribed in my presence,

April  30          , 2013 at 2:20 PM at Milwaukee, Wisconsin
Date                                                                City and State

The Honorable William E. Callahan, Jr.
United States Magistrate Judge                  _____
**Name & Title of Judicial Officer**            Signature of Judicial Officer

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, David L. Baker, have been duly sworn on oath, state as follows:

## I.     TRAINING AND EXPERIENCE

1.      I have been a Detective of the Milwaukee Police Department for approximately 28 years. I am currently assigned to the Milwaukee High Intensity Drug Trafficking Area (HIDTA) Drug Gang Task Force. I am federally deputized by the United States Department of Justice, Federal Bureau of Investigation. I have participated in numerous complex narcotics investigations which involved violations of state and federal controlled substances laws and money laundering laws including Title 21, United States Code, Sections 841(a)(1), 843(b) and 846, and Title 18, United States Code, Sections 1956 and 1957, and other related offenses. I have had both formal training and have participated in numerous complex drug trafficking investigations, including ones using wiretaps. Based on my training, experience and participation in drug trafficking investigations and associated financial investigation involving large amounts of cocaine, crack cocaine, marijuana and/or other controlled substances, I know and have observed the following:

   a.     I have learned about the manner in which individuals and organizations distribute controlled substances in Wisconsin as well as in other area of the United States;

   b.     I am familiar with the coded language utilized over the telephone to discuss drug trafficking and know that the language is often limited, guarded and coded. I also know the various code names used to describe controlled substances;

   c.     I know large-scale drug traffickers often purchase and/or title their assets in fictitious names, aliases or the names of relatives, associates or business entities to avoid detection of these assets by government agencies. I know that even though these assets are in the names other than the drug traffickers, the drug traffickers actually own and continue to use these assets and exercise dominion and control over them;

   d.     I know large-scale drug traffickers must maintain on-hand, large amounts of U.S. currency in order to maintain and finance their ongoing drug business;

e.      I know it is common for persons involved in large-scale drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and/or expenditure of drug proceeds, such as currency, financial instruments, precious metals and gemstones, jewelry, books, records of real estate transactions, bank statements and records, passbooks, money drafts, letters of credit, money orders, passbooks, letters of credit, bank drafts, cashier's checks, bank checks, safe deposit box keys and money wrappers. These items are maintained by the traffickers within residences, businesses or other locations over which they maintain dominion and control;

f.      I know it is common for drug traffickers to maintain books, records, receipts, notes ledgers, airline tickets, receipts relating to the purchase of financial instruments and/or the transfer of funds and other papers relating to the transportation, ordering, sale and distribution of controlled substances. That the aforementioned book, records, receipts, notes, ledger, etc., are maintained where the traffickers have ready access to them;

g.      It is common practice for individuals who are involved in business activities of any nature to maintain books and records of such business activities for lengthy periods of time. It is also common practice for individuals who maintain these records to keep them in places that are secure but easily accessible such as in their businesses, offices, or personal residence.

h.      It is also common that individuals who are attempting to conceal their true income from the IRS will maintain records that will establish their true ownership of assets or other expenditures in a secret manner. These records have included bank records, automobile titles, property deeds, cashier's check receipts, money order receipts, wire transfer receipts, documents pertaining to storage facilities or safe deposit boxes, documents or agreements detailing the true ownership of assets, photographs of the true owners with the concealed assets, or other items such as sales receipts, purchase orders, or shipping invoices.

i.      Likewise, it is common for businesses who engage in transactions with individuals involved in criminal activity to conceal the nature of the transactions through false records such as invoices, by maintaining false financial records, or placing the transaction in a nominee name. These businesses may need to keep these false records for inventory or bookkeeping reasons. However, these false records may be placed in a separate location such as a personal residence, safe, or safe deposit box for concealment.

j.      I know large-scale drug traffickers often use electronic equipment such as telephones (land-lines and cell phones), pagers, computers, telex machines, facsimile machines, currency counting machines and telephone answering

2

machines to generate, transfer, count, record and/or store the information described in the items above, as well as conduct drug trafficking activities;

k.  I know when drug traffickers amass large proceeds from the sale of drugs, the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize the following methods, including, but not limited to: domestic and international banks and their attendant services, securities brokers, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts and otherwise legitimate businesses which generate large quantities of currency;

l.  I know that the Currency Transaction Report (CTR) (Fincen Form 104), which is required to be completed and filed with the IRS by all financial institutions on every currency transaction that exceeds $10,000, causes tremendous problems with drug traffickers when they attempt to negotiate their illegal profits at a financial institution; I further know that the courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, in particular, trafficking in controlled substances;

m.  I know drug traffickers commonly maintain addresses or telephones numbers in books or papers which reflect names, addresses and/or telephone numbers of their associates in the trafficking organization; and

n.  I am familiar with computers, cellular telephones, pagers and their uses by drug traffickers to communicate with suppliers, customers, and fellow traffickers and by those engaged in money laundering activities to communicate with their associates and financial institutions; That drug traffickers use these devices to record their transactions and aspects of their lifestyle related to drug dealing, whether in the form of voicemail, email, text messages, video and audio clips, floppy disks, hard disk drives, flash drives, CD's, DVD's, optical disks, Zip disks, flash memory cards, Smart media and any data contained within such computers or cellular telephones, electronic storage media and other settings particular to such devices; I know that such devices automatically record aspects of such communications, such as lists of calls and communications, and any particularized identification assigned to those source numbers or email addresses by the owner of the devices.

o.  Specifically, I know the following information can be retrieved to show evidence of use of the computer to further the drug trade and/or money laundering activities; Computer systems and cellular telephones, including but not limited to system components, input devices, output devices, data storage devices, data transmission devices, and network devices and any data contained within such systems; and computer media and any data contained within such media and other material relating to computer systems and the internet including but not limited to, documentation, operating system software, application or access program disks,

3

manuals, books, brochures, or notes; and computer access codes, user names, log files, configuration files, and passwords, screen names, email addresses, IP addresses and cellular / wireless telephones, SIM cards, any removable storage devices for telephones, and any data contained therein, including but not limited to stored telephone numbers, recently called numbers list, text messages, digital audio and / or video recordings, pictured, settings, and any other user defined settings and / or data.

2.      This affidavit is based upon my personal knowledge and information reported to me by other federal, state, and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable. This affidavit is based upon information provided by other law enforcement officers who compiled this information from police reports, public records, pen register and trap and trace information, search warrants, garbage searches, subpoenaed records, mail cover, federally authorized wiretaps, cooperating citizen witnesses, informants, and cooperating defendants, whose reliability is established separately herein.

3.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.

4.      Throughout this affidavit, I rely on the records of the Wisconsin Department of Transportation (WDOT) since they are official records, kept in the ordinary course of business, which are updated on a regular basis.  I also rely on the records of Wisconsin Energies (WE) because they are business records maintained for billing purposes, kept in the ordinary course of business, and are also updated on a regular basis.

5.      Because this affidavit is submitted for the limited purpose of securing authorization for a criminal complaint and corresponding arrest warrants for the above-listed listed Target Subject, I have not included each and every fact known to me concerning this

4

investigation. I have set forth only the facts that I believe are essential to establish the necessary foundation for the criminal complaint and arrest warrant.

## II.  TARGET SUBJECT

6.      Based on my personal participation in this investigation, I am familiar with all aspects of this investigation.  On the basis of this familiarity, and on the basis of other information which I have reviewed and determined to be reliable, I allege the facts contained in this affidavit show that there is probable cause to believe that on or about November 27, 2012, in the State and Eastern District of Wisconsin, **Froylan Bautista** (Target Subject) did knowingly and intentionally distribute a mixture and substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846, and Title 18, United States Code, Section 2 (Target Offense)).

## III.  PROBABLE CAUSE

7.      In early 2010, case agents from the Milwaukee Police Department (MPD), the Federal Bureau of Investigation (FBI) and the Milwaukee Area High Intensity Drug Trafficking Area (HIDTA) began investigating a cocaine trafficking organization (CTO) which was responsible for distributing large amounts of cocaine in Milwaukee County, Wisconsin.  As indicated below, the investigation to date has determined that Froylan Bautista obtains kilogram quantities of cocaine from numerous cocaine distributors in the Milwaukee and Northern Illinois area. The distributors of the cocaine transport it to Eastern District of Wisconsin by private vehicles and are purchased by Bautista.  Once the cocaine arrives in the Milwaukee area, it is stored at 3323 West Arthur Street, Milwaukee, WI, where Bautista's current or former girlfriend resides.  Portions of the cocaine are broken into smaller quantities, which is stored at 2130 South

5

32nd Street, Milwaukee, WI, where Bautista and another girlfriend reside and where Bautista distributes cocaine to his customers. Finally, Bautista receives mail at and keeps vehicles registered to 1946 South 21st Street, Milwaukee, WI, where his deceased parents formerly resided.

### A.    Background

8.    During the course of the investigation, case agents conducted interviews with numerous confidential informants, who provided detailed information about the current and past drug-trafficking activities of Froylan Bautista and his associates.

**Confidential Informant 12-015 (CS-12-015)**

9.    According to CS-12-015, Froylan Bautista, also known as "Fro," has a girlfriend who lives at 3323 West Arthur Street, while Bautista lives at 2130 South 32nd Street with another girlfriend. Bautista told CS-12-015 that he is the owner of 3323 West Arthur Street and 2130 South 32nd Street. Bautista breaks down kilogram quantities of cocaine into smaller distribution quantities and stores cocaine in the basement of 3323 West Arthur Street.

10.    Case agents are aware that according to City of Milwaukee Assessor records, 3323 West Arthur Street is owned by Kara L. Gonzalez, and 2130 South 32nd Street is owned by Veronica Vargas. Based on their training and experience, and the investigation to date, case agents believe that Bautista owns 3323 West Arthur Street and 2130 South 32nd Street, but keeps both residences titled in nominee names to avoid detection by law enforcement.

11.    On numerous dates between July 2012 and April 2013, CS 12-015 was interviewed and provided detailed information about the current and past drug-trafficking activities of subjects associated with this Drug Trafficking Organization (DTO). For several reasons, case agents believe the information provided by CS 12-015 is reliable and credible.

6

First, CS 12-015 has been providing information since July 2012. Second, CS 12-015's information is substantially against CS 12-015's penal interest. Third, the information provided by CS 12-015 is consistent with evidence obtained elsewhere in this investigation where CS 12-015 was utilized, and/or substantial portions of CS 12-015's information have been corroborated through independent investigation, including recorded conversations, surveillance, and information from other confidential sources. CS 12-015 provided information to case agents regarding his involvement with the DTO which included identifying his co-conspirators and techniques used by the DTO to avoid law enforcement detection. During subsequent debrief interviews with CS 12-015, s/he positively identified photographs of co-conspirators and agreed to cooperate with the United States government by providing testimony against the subjects in federal court when and if called upon. CS 12-015 made more than three controlled buys at the direction of case agents, which led to a search warrant that resulted in the seizure of controlled substances and evidence of drug trafficking. CS 12-015's information also has been corroborated through other confidential informants. Finally, CS 12-015 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed. CS 12-015 has no prior convictions. CS 12-015 has not been charged, but could face federal charges related to drug offenses, and is hoping for consideration from the court when charges are filed.

12.     CS-12-015 has known Froylan Bautista since 1994 or 1995, and they know each other through the contracting, painting, and carpetry business. CS-12-015 first started buying marijuana from Bautista, and CS-12-015 estimated that s/he purchased between purchased 100 to 200 pounds of marijuana from Bautista in a period of 2 to 3 years. CS-12-015 stated that during the years of 2002 to 2004, CS-12-015 was buying about one quarter kilogram per week and

7

about 20 pounds of marijuana month from Bautista. During 2002 and 2004, CS-12-015 purchased 10-12 kilograms of cocaine and 100 pounds of marijuana from Bautista. During the end of 2008 or the beginning of 2009, CS-12-015 was buying about one kilogram of cocaine per month from Bautista to meet the customer demand. CS-12-015 estimated that s/he purchased about 24-25 kilograms of cocaine total from Bautista from the end of 2008 or beginning of 2009 to the summer of 2012.

13.     CS-12-015 stated that in February 2012, s/he entered 3323 West Arthur Street from the back door, went downstairs to the basement, and saw cocaine in the basement near a washing machine. CS-12-015 stated that Bautista has packaging materials and scales at 3323 West Arthur Street so he can break down the cocaine and re-package it for re-sale. CS-12-015 stated that Bautista also hides cocaine in the basement ceiling at 2130 South 32nd Street, and Bautista occasionally stores small quantities of cocaine in the garage at 3323 West Arthur Street. CS-12-015 stated that Bautista keeps some cocaine at 2130 South 32nd Street. CS-12-015 stated that Bautista does not like people to come by 3323 W Arthur St and that he usually has customers come to the residence of 2130 South 32nd Street to conduct drug transactions.

14.     CS-12-015 stated that Froylan Bautista does not have legitimate employment and is not a mechanic, although Bautista frequently uses the word "mechanic," or other related terms as code words for cocaine. CS-12-015 was last at 3323 West Arthur Street in approximately February or March of 2012.   At that time, Bautista "fronted," or sold to CS-12-015 on consignment basis, between one quarter and one half kilogram of cocaine. CS-12-015 stated that Bautista was driving a black sports utility vehicle, possibly a GM Envoy. CS stated that on that date, Bautista parked the black SUV at the rear of 3323 W Arthur Street.

8

15.     CS-12-015 further stated that CS 13-01, discussed in detail below, also purchased cocaine from Bautista.   According to CS-12-015, CS 13-01 was Bautista's regular cocaine customer. Additionally, CS-12-015 purchased cocaine from CS 13-01 in the past. CS 12-015 knows that CS 13-01 has met Bautista at 2130 South 32nd Street and other various locations within the Milwaukee area to obtain ccoaine.  CS-12-015 stated that s/he had received a quarter kilogram of cocaine 2-3 times from CS 13-01, who was being supplied by Bautista. CS-12-015 would get the cocaine from CS 13-01 if CS-12-015 's alternative supplier did not have anything. CS 13-01 also purchased cocaine from CS-12-015 when CS-12-015 had cocaine from an alternative supplier. CS-12-015 stated that CS 13-01 purchased about a half a kilogram of cocaine every 2-3 weeks for every two years, on and off. CS 13-01 would combine money with his/her cousin.  CS-12-015 may have seen Bautista's cocaine supplier once a long time ago. CS-12-015 described Bautista's cocaine supplier as a Mexican male, approximately 5 feet, nine inches tall, with a medium to thin build and black hair. CS-12-015 stated that Bautista travels to Waukegan, Illinois to obtain kilograms of cocaine.

**Confidential Informant 13-01 (CS 13-01)**

16.     On January 8, 2013, following execution of a search warrant at his/her residence, CS 13-01 met with case agents and discussed drug sources in the Milwaukee area. On numerous dates between January 2013 and April 2013, CS 13-01 was interviewed and provided detailed information about the current and past drug-trafficking activities of subjects associated with this DTO.  CS 13-01 stated s/he and Froylan Bautista know each other from childhood. According to CS 13-01, CS 12-015 and Bautista are very private about their drug dealing business. CS 13-01 started to purchase cocaine from CS 12-015 in 2010. CS 13-01 purchased "splits" (4.5 ounces) of cocaine from CS 12-015 in the past. CS 13-01 admitted to purchasing cocaine from CS 12-015

9

for over two years, but said the cocaine from CS 12-015 was not consistent with his or her supply of cocaine. CS 13-01 would only purchase powder cocaine and did not buy crack cocaine.

17.    CS 13-01 stated that his/her first deal with CS 12-015 was a "split" (4.5 ounces) of cocaine and that it was fronted, or sold on consignment. CS 13-01 stated that CS 12-015 charged $4500 for 4.5 ounces of powder cocaine. CS 13-01 stated that in 2010 the first deal with CS 12-015 had occurred at a Home Depot parking Lot located at 124th and Capitol Streets and that CS had 2-3 days to pay for the cocaine. CS 13-01 stated that if CS 12-015 had more cocaine a week later s/he would buy from CS 12-015. CS 13-01 believed that CS 12-015's supplier was two hours away and south of Milwaukee. CS did not know who CS 12-015 supplier was, nor did s/he ever meet CS 12-015's cocaine supplier.

18.    For several reasons, case agents believe the information provide by CS 13-01 is reliable and credible. First, CS 13-01 has been providing information since January 2013. Second, CS 13-01's information is substantially against CS 13-01's penal interest. Third, the information provided by CS 13-01 is consistent with evidence obtained elsewhere in this investigation where CS 13-01 was utilized, and/or substantial portions of CS 13-01's information have been corroborated through independent investigation, including recorded conversations, surveillance, and information from other confidential sources. For example, CS 13-01 provided information to case agents regarding his involvement with the DTO which included conducting recorded meetings with targets of this investigation, identifying his co-conspirators and techniques used by the DTO to avoid law enforcement detection. During subsequent debrief interviews with CS 13-01, s/he positively identified photographs of co-conspirators and agreed to cooperate with the United States government by providing testimony against the subjects in federal court when and if called upon. Finally, CS 13-01 has had an adequate opportunity to

10

directly observe the events discussed and/or has heard conversations directly from the individuals discussed. CS 13-01 has no felony convictions. CS 13-01 is cooperating in an attempt to earn consideration in a potential federal case.

19. CS 13-01 stated that s/he would sometimes get cocaine from Bautista and that prices between Froylan Bautista and CS 12-015 were generally the same; CS 13-01 would buy from whoever had the cocaine available to sell. CS 13-01 stated that on occassion, when s/he purchased cocaine from Baustita, CS 13-01 would sometimes have to sell the cocaine to CS 12-015. CS stated that this occurred about 5-6 times in 2011 for about 6 months, and that was because CS 12-015's line of cocaine was not consistent and CS 12-015 wanted to keep his customers. CS 13-01 would give CS 12-015 a "nine piece or split" (9 ounces or 4.5 ounces) depending what CS 12-015 needed and CS 13-01 charged CS 12-015 just enough to break even or "just make $100" on the drug deal. CS stated that Bautista and CS 12-015 would argue a lot and that was why CS 13-01 would have to middle the deals between Bautista and CS 12-015. CS stated that Bautista charged $8500 for nine ounces of cocaine. CS stated that both CS 12-015 and Froylan Bautista worked on a system where the cocaine was given out on consignment to CS 13-01 and s/he had about a three day window to pay off his/her debt on the cocaine.

**B.    Controlled purchases, text message search warrant, and surveillance**

20. According to CS 12-015, Bautista said that he stores his boat and classic car in a storage unit. On August 20, 2012, case agents conducted surveillance at Storage Mart, 4400 South 13th Street, Milwaukee, WI, a storage facility. Case agents observed a black convertible bearing Wisconsin license plate 739UAN which lists to Froylan R. Baustista, DOB: XX/XX/1937 of 1946 South 21st Street, Milwaukee, WI on a 1965 Lincoln Convertible VIN 5Y86N416736. Case agents also observed a boat with registration numbers displayed of WS

11

8615 CZ. According to Wisconsin Department of Natural Resources, the registration lists to Kara Gonzalez, DOB: XX/XX/1971, 2130 South 32nd Street, Milwaukee, WI 53215 on a 1993 21' Four Winns cabin boat. Public records reflect that Froylan R. Bautista died in February 2012.

21. On September 30, 2012, CS 12-015 made contact with Froylan Bautista by calling phone number (414) 391-5831 and arranged to purchase 2.5 ounces of cocaine. CS 12-015 knows from past dealings with Bautista that he only uses the phone for a couple of weeks and then changes the phone number so the phone does not get traced back to Baustista. On September 30, 2012, CS 12-015 was contacted by Froylan Bautista who was using cell phone (414) 391-5831. In the recorded call, Bautista told CS 12-015 that he had ounces of cocaine for sale and wanted to know if CS 12-015 wanted to purchase any. Under the direction of law enforcement officers, CS 12-015 agreed to the purchase of 2.5 ounces of cocaine. CS met case agents at a pre-determined location and CS 12-015 was searched for any contraband or money with negative results. CI's vehicle was searched for any contraband or money with negative results. CS 12-015 was provided with $4,000.00 pre-recorded US currency. CS 12-015 was provided with a body recorder and it was activated. Case agents followed CS 12-015 to Bautista's residence, 2130 South 32nd Street, Milwaukee, WI, and CS 12-015 went into the residence. CS 12-015 met with Bautista and they went into the basement of the residence. CS 12-015 observed Bautista go to a removable ceiling panel and got out a scale and a plastic bag of cocaine. Bautista weighed the bag of cocaine and it showed a weight of 71.5 grams. CS 12-015 gave Bautista the $4,000.00. Bautista said that he expected another 9 ounces of cocaine in a few days. Bautista told CS 12-015 that he had about six (6) to seven (7) guys he was serving with cocaine. Bautista told CS 12-015 that some of the guys were 'Brent," "Daniel", and "Elsa". CS

12

12-015 paid Bautista $4000 for the cocaine and CS 12-015 left the house. CS 12-015 left the residence and met with case agents. The body recorder was recovered and the cocaine was recovered. A search of CS and CS's vehicle were conducted by case agents and negative results for any contraband or money. The cocaine was tested with a field test and it was positive for cocaine and had a weight of 70.32 grams without packaging. Case agents listened to the body recorder and it was consistent with CS's statement.

22. During the controlled buy at 2130 South 32nd Street on September 30, 2012, case agents observed two vehicles parked behind the residence. The vehicles were a black Chevrolet Tahoe bearing Wisconsin license plate 723SRK/WIS which lists to Kara L. Gonzalez, 2130 South 32nd Street and a black Chevrolet Silverado pick up bearing Wisconsin license plate JS4165 which lists to Froylan Bautista Jr, 1946 South 21st Street, Milwaukee, WI.

23. On October 5, 2012, CS 12-015 made a purchase of one ounce of powder cocaine from Bautista at 2130 South 32nd Street. CS 12-015 was contacted by Bautista using cell phone (414) 391-5831. During this recorded call, Bautista told CS 12-015 that he (Bautista) had ounces of cocaine for $1,600 if CS 12-015 wanted some. Under the direction and supervision of case agents, CS 12-015 told Bautista that CS 12-015 wanted to buy some. CS 12-015 met with case agents and CS and CS's vehicle were searched for money and/or contraband with negative results. CS 12-015 was provided with $1,600.00 pre-recorded US currency and a body recorder. Case agents followed CS 12-015 to Bautista house, 2130 South 32nd Street. CS 12-015 went into the house and met with Bautista. CS 12-015 observed a large bag of cocaine in the kitchen and Bautista provided CS 12-015 with one ounce of cocaine. CS 12-015 observed 5 separate bags of cocaine and CS 12-015 believed each one was an ounce. CS 12-015 paid Bautista the money of $1,600. Bautista said that he had re-rock cocaine for $1,200 an ounce and he also had pills for

13

sale. CS 12-015 said that CS 12-015 had to go and CS 12-015 left the residence and met with case agents. Case agents searched CS and CS's vehicle for any contraband and/or money with negative results. CS 12-015 turned over the body recorder and the cocaine. A sample of the cocaine purchased was subjected to a field test and it tested positive of cocaine. The weight of the 27.76 grams without packaging. Case agents listened to the body recorder and it was consistent with CS 12-015's statement.

24.     During the controlled buy at 2130 South 32nd Street on October 5, 2012, case agents observed two vehicles parked behind 2130 South 32nd Street. The vehicles were a black GMC Acadia SUV bearing Wisconsin license plate 144NCG/WIS which lists to Kara L. Gonzalez, 2130 South 32nd Street, Milwaukee, WI, and a black Chevrolet Silverado pick up, bearing Wisconsin license plate JS4165, which lists to Froylan Bautista Jr, 1946 South 21st Street, Milwaukee, WI.

25.     On November 14, 2012 at 4:18 PM (CDT), CS-12-015 received a text message from Bautista at phone number (414) 389-7417 which said the following: "This is my Nw number. Jus text me on this phone for now on. I will not answer it!!! Fro." CS sent a reply text message to confirm CS got the text. CS advised that Bautista changed out his drug phone to this new phone number. CS knows from the past that Bautista does provide his customers and suppliers with his new phone either by text or by calling them. CS advised that from the text message Bautista wanted to utilize the phone for texting.

26.     On November 14, 2012 at 5:38 PM (CDT), CS 12-015 received a text message from Bautista at phone number (414) 389-7417, which said the following: "Watever! Its holiday time that's wen niggas get pinched to C if they snitch So they can B out wit there Fams 4 da holiday. Foo!" Based on my training and experience, and the investigation to date, case agents

14

believe that Bautista was concerned about being targeted drug dealers being arrested by law enforcement just prior to the holidays and then using them to set up drug transactions with Bautista instead of going to jail for the holidays.

27.    On November 27, 2012, CS (CS 12-015) conducted a controlled purchase of cocaine from Bautista. CS 12-015 was provided with a body recorder and it was activated at 12:55 PM. Case agents searched CS 12-015's vehicle for any contraband and money with negative results. CS 12-015 left the meet location and arrived at 2130 S 32nd Street at 1:05 PM. Case agents observed CS 12-015 park behind 2130 S 32nd Street and walk into the rear yard at about 1:09 PM. At about 1:20 PM, CS 12-015 departed 2130 S 32nd Street and returned back to the meet location. At 1:26 PM, the body recorder was turned off by case agents. CS 12-015 stated that s/he went into the house using the side door (south) and talked with Froylan Bautista in the hallway between the basement, kitchen, and back door. While in the hallway, Froylan Bautista stated that he got a "brick" (kilogram of Cocaine) and that he was breaking it down in smaller quantities for resale purposes. Froylan Bautista had a plastic bag that contained a large quantity of cocaine which was laying on one of the steps in the hallway. Froylan showed CS the cocaine and told CS 12-015 that the cocaine was "good." CS 12-015 viewed the cocaine and it was good quality and that it was not re-rocked. Froylan Bautista stated that he had four (4) "splits" (4.5 ounces of cocaine) in the bag and that was what he had left from the "brick". Froylan told CS 12-015 that he would sell splits or better for $1200 an ounce ($5400- 4.5 ounces; $10,800 - 9 ounces). CS told Froylan Bautista that CS 12-015 would have to check on CS 12-015 's money and that CS 12-015 did not want to hold Froylan Bautista from selling them if he has other buyers. Case agents observed two (2) vehicles parked behind the house, a black Chevy Pick up with Wisconsin license plate JS4165/WIS, which lists to Froylan Bautista Jr at 2130

15

South 32nd Street, Milwaukee, WI and a Black Audi 4 door with Wisconsin Dealer plate of 3071F.

28.     On December 13, 2012, United States Magistrate Judge Nancy Joseph issued a search warrant for the text message content for Bautista's cellular telephone, 414-389-7417. Case agents conducted a review of the message content received and observed text messages going to 414-477-7739 which lists in public records to Veronica Vargas of 3323 West Arthur Street, Milwaukee, WI. The following text messages were obtained pursuant to the warrant:

- On November 14, 2012, Bautista texted Vargas his new number and told her he will be there, (3323 West Arthur Street) in five minutes. Bautista texts Vargas "I thought u were gona do the Cortina (curtain) thing."

- On November 15, 2012, Bautista texted ":)11:40" and Vargas responds with as text "u leave $". Bautista replies "sorry mama! It was'nt wat he said it was. It was'nt worth it so I said 4get it."

- On November 17, 2012, Bautista texts ":)6:45"

- On November 22, 2012, at approximately 12:14am, Bautista texts to Vargas, "I need to get some tools ata the garage, (3323 West Arthur Street) 2maro morning there the same tools I used to fix the last car wit Its going real slow cuz nobodies realy feeling these tools u shud B done by Sun then I cud fix a whole nother car Hopefuly." Bautista texts ":-)11:46" and Vargas replies "k.

- On December 7, 2012, Bautista texted to Vargas, "can u turn on da lights," he sends a second text "I left 2 and u pase dollar in the same spot at (3323 West Arthur Street). Ur welcome." Case agents know that the Spanish translation for "un pase" is a folded up bill containing cocaine. Vargas replies in two text messages, thank-you. Bautista texts Vargas, "Damn bitch u cant even say thank u" and then sends another text, "U need to know i aint talkn shit. Im serious then a heart attack." Vargas replies, "ck your mesgg 7:13 I said thank u." Bautista sends text, "oh my bad mam! Bcareful that pase dollar is wicked. It mite make u horny. Call me ill go down 4u. :-)" Vargas texts back, "Always talking shit..but thanks."

29.     Based on their training and experience, and the investigation to date, case agents believe that Bautista stores cocaine and drug proceeds at 3323 West Arthur Street, Milwaukee,

16

WI. Baustista used his cellular telephone to advise Vargas via text message when he would be present at the address to pick up cocaine and to advise her how much his customers delivered to the address as payment for cocaine.

30.     On February 18, 2013, case agents conducted physical surveillance at 3323 West Arthur Street. At approximately 1:28 p.m., case agents observed a 2009 black GMC Acadia bearing Wisconsin license plate 144NCJ, registered to Kara L. Gonzalez of 2130 South 32nd Street, parked at the southeast corner of South 34th Street and West Arthur Street. At 2:33 PM, case agents observed the car lights blink on and off. At 2:35 PM, case agents observed Froylan Bautista exit the alley behind 3323 West Arthur Street and enter the black Acadia. The vehicle drives into the alley behind the target location and then northbound on 33th Street. At 2:37 PM, case agents observed the listed car parked behind 2130 South 32nd Street. Based on their training and experience, and the investigation to date, case agents observed Froylan Bautista drive between the two residences he is associated with, 3323 West Arthur Street and 2130 South 32nd Street.

31.     On April 4, 2013, CS 12-015 agreed to meet with Bautista at 2130 South 32nd Street, Milwaukee, WI at the direction of case agents. At 6:10pm CS 12-015 sent a text message to Bautista's "home line" 414-248-5523 to find out where he was, and to find out his new phone number. CS 12-015 then placed a phone call to 414-248-5523 and Bautista answered the phone. Bautista told CS 12-015 was is in the middle of something and that Bautista will call CS 12-015 back in approximately 15 minutes. At 6:34pm CS 12-015 received a text from 414-530-1246, "Im home," which CS 12-015 advised was Bautista's new cell phone number and that Bautista was at his residence, 2130 South 32nd Street. CS was given a recorder and went to the address of

17

2130 South 32nd Street to meet Bautista.  At 6:35pm recorder was turned on and arrives at 6:40pm to house. Recorder was turned off at 7:17 pm.

32.     Case agent reviewed the audio recording from April 4, 2013 and heard the following: CS 12-015 is heard knocking on the door at 2130 South 32nd Street, and Bautista is greets him and they talk about Bautista's weight and laugh.  Bautista tells CS about meeting some guys related to CS 13-01 at the bar. Bautista tells CS that the guys at the bar are CS 13-01's cousins. Bautista tells CS CS 12-015 that when CS 13-01 was getting "raided" by police CS 13-01's phone was getting "blown up" by Bautista (meaning Bautista was repeatedly calling CS 13-01's phone). Case agents are aware that a search warrant was executed at CS 13-01's house in January 2013.

33.     Bautista goes to say that he was glad he had used his burner phone and that there is no way to connect his name to the phone. Bautista thinks that CS 13-01 is trying to justify using or telling on him (Bautista). Bautista told CS 12-015 that CS 13-01 still owes him money. Bautista tells CS that CS 13-01 never knew his last name, where he works, and that CS 13-01 does not know anything about him. Bautista stated that if police were to try to trace the phone number, he used a fake name to get the phone. Bautista tells CS that name he used was Juan Garza. During the course of the investigation, case agents identified more than ten phone numbers used by Bautista between July 2012 and the present.  Review of approximately two months of phone numbers associated with Bautista reflects that he had frequent contacts with Kara L. Gonzalez of 2130 South 32nd Street, Antonia Bautista of 1946 South 21st Street, and Vanessa Vargas, of 2130 South 32nd Street.  Based on their training and experience, and the

18

investigation to date, case agents are aware that drug traffickers frequently change their phone numbers to avoid detection by law enforcement.

34.     Bautista went on to state that CS 13-01 only knows him (Bautista) by the name of "Fro," and that CS 13-01 would have to point out his house, 2130 South 32nd Street, to the police. Bautista states that the house, 2130 South 32nd Street is not in his name. Bautista states that he uses his dad's residence, 1946 South 21st Street, as his primary residence, and that even his mail goes to dad's house and that "everything goes there," and that there is no way to connect him (Bautista) to his current address 2130 South 32nd Street. Case agents are aware that a check of Wisconsin DOT records reveals that Bautista uses 1946 South 21st Street as his residence on his Wisconsin driver's license.

35.     Bautista went on to tstate that he hopes CS 13-01 still cares for him and does not talk about him (Bautista) to the police. Bautista said he was concerned about that CS 13-01 lied to Julio (Cruz) and told him that s/he (CS 13-01) was pulled over in a traffic stop by police and that s/he (CS 13-01) was let go.  Bautista said there was a guy who was trying to pay $700 to CS 13-01, and that CS 13-01 would not take the money/payment, even though CS 13-01 owes Bautista money. Bautista states that the police were in CS 13-01's backyard, and that the police had looked through everything and that it was obvious because the tarp was messed up. Bautista states he and Julio have talked about CS 13-01 lying to them and no one knows what charges CS 13-01 is caught up with.  Bautista talks about CS 13-01's after hhours parties and about the vacuumed sealed pounds of "dro" (meaning hydroponic marijuana) that CS 13-01 would keep in CS 13-01's closet located in s/he's basement, called the "little work shop area for weed."

19

36.     Bautista told CS 12-015 that ever since CS 13-01 was caught, he (Bautista) has not been able to sleep lately. Bautista tells CS 12-015 that he thinks he is going to stop selling drugs. Bautista told CS 12-015 that Kara (Gonzalez) had talked about maybe he (Bautista) should stop selling drugs because he is going to be 44 years old, and that he has grandson. Bautista stated that he is going to pass on his drug business to Daniel (Bautista). Bautista told CS 12-015 that he wants to find someone that doesn't look "scandalous," meaning someone who does not draw attention to his drug activities. Bautista told CS 12-015 that he (Bautista) has shown Daniel the "spot" 3323 West Arthur Street, Milwaukee, WI, and how the business runs. Bautista wanted to introduce Daniel to his suppliers and his customers. CS 12-015 volunteered to take over Bautista's drug business, and reminded him they have known each other for 20 years. Bautista stated that he doesn't trust CS 12-015 and doesn't want to be cut out of the business; Bautista still wants his cut of the profits.

37.     Bautista and CS 12-015 compared prices for an ounce of cocaine. Bautista told CS 12-015 that guys are complaining about the price and don't want to pay $6100 for a split (4.5 ounces of cocaine). Bautista talked about a past drug deal involving re-rock and the price that was offered to Bautista. Bautista tells CS 12-015 about a supplier of his who went to Mexico three times. Bautista tells CS 12-015 that whole one is around "45" and that all CS 12-015 has to know that he (Bautista) charges $6100 for a split. Bautista tells CS 12-015 that he has "four "in the car, meaning he has cocaine in the car now.   Bautista and CS 12-015 talked about cocaine prices. Bautista is heard figuring the prices he is charging for an ounce of cocaine out loud, and tries to figure what he (Bautista) is charging for an ounce at $6100 for a split, and that two splits are $12,200. Bautista told CS 12-015 about a job doing a fire pit and continues to figure the math

20

for what he charges for an ounce of cocaine. CS 12-015 asked for a cheaper price on the cocaine and Bautista told CS 12-015 he will not go lower. Bautista talks about indoor "Cush" (marijuana) that he (Bautista) can get for $2800-3800 a pound, and that he was in turn selling the same pounds for $4200-4300 and making a nice profit. Bautista commented on the house were the indoor marijuana is being grown, and said that the smell from the indoor grow is really strong when the door opens into the residence where the marijuana is being grown. Bautista told CS 12-015 that he purchased "eight" (meaning pounds) and sold them right away.

38.    Bautista and CS 12-015 returned to talking about CS 13-01. Bautista told CS 12-015 that he had promised Kara that around his birthday, he will be 44 years old, and that he will quit selling the cocaine. Bautista stated that he will turn over the business to Daniel. Bautista comments that he can't do ten years in jail. Bautista laugeds with CS 12-015 and commented on his (Bautista) supplier and how CS 12-015 wants it. Bautista asked how long will it take for CS 12-015 to get the money for the split. Bautista told CS 12-015 that he (Bautista) was leaving for Las Vegas next Saturday and that Bautista could give CS 12-015 the split (4.5 ounces of cocaine) before he left for Las Vegas. CS 12-015 told Bautista that CS 12-015 would get back to him.

39.    During the undercover meeting with Bautista on April 1, 2013, case agents observed vehicles parked at 2130 South 32nd Street, including a black Chevrolet Silverado pickup with Wisconsin license plate JS4165, which lists to Froyland Bautista of 1946 South 21st Street and a black Lincoln MSV suv with plate 986MSV/WIS which lists to Alicia M. Gonzalez of 4170 South 5th Place, Milwaukee, WI.

Case 2:13-mj-00481-WEC   Filed 04/30/13   Page 22 of 23   Document 1

## VI.    CONCLUSION

40.      Based upon the facts set forth above, I allege the facts contained in this affidavit show that there is probable cause to believe that on November 27, 2012, in the State and Eastern District of Wisconsin, Froylan Bautista, (Target Subject) did knowingly and intentionally distribute a mixture and substance containing cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), (b)(1)(C), and 846, and Title 18, United States Code, Section 2 (Target Offense)).